**IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO COLUMBUS DIVISION**

| | |
|---|---|
| MELODY BOWMAN,<br><br>Plaintiff,<br><br>v.<br><br>WELLA OPERATIONS US LLC D/B/A THE WELLA COMPANY; L'ORÉAL USA, INC.; L'ORÉAL USA PRODUCTS, INC.; WELLA INTERNATIONAL OPERATIONS SWITZERLAND S.À.R.L.; L'ORÉAL S.A.<br><br>Defendants. | Case No. ___________<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Melody Bowman brings this action against Defendants Wella Operations US LLC d/b/a The Wella Company ("Wella"), L'Oréal USA, Inc., L'Oréal USA Products, Inc. (collectively, "L'Oréal") (and altogether, "Defendants") for claims under the Ohio Product Liability Act for injuries caused by prolonged occupational exposure to professional hair dye products designed, formulated, manufactured, labeled, marketed, sold, and/or supplied by Defendants.

## PARTIES

1. Plaintiff Melody Bowman is, and at all times relevant to this action was, a citizen and resident of Columbus, Ohio.

2. Wella Operations US LLC d/b/a the Wella Company is a Delaware limited liability company with its principal place of business and headquarters located at 4500 Park Granada, Suite 100, Calabasas, California 91302. Its citizenship is that of each of its members. Upon information and belief, Wella is an indirect wholly owned subsidiary of WavesUKDivestCo Ltd., a United Kingdom company.

3. Wella International Operations Switzerland S.à.r.l. ("Wella International") is a Société à Responsibility Limitée headquartered in Geneva, Switzerland. Wella maintains two American offices—one in New York, New York, and another in Calabasas, California—and is the parent company of Wella Operations US LLC d/b/a the Wella Company.

4. Defendant Wella International is liable to Plaintiff under the facts alleged in this complaint by virtue of its own acts and omissions, as well for the acts and omissions of its agents, joint venturers, and alter ego subsidiary, Defendant Wella.

5. L'Oréal USA, Inc., is a Delaware corporation with its headquarters and principal place of business located at 575 Fifth Avenue, New York, New York 10017.

6. L'Oréal USA Products, Inc., is a Delaware corporation with its headquarters and principal place of business located at 10 Hudson Yards 347, 10th Avenue, New York, New York 10001.

7. Defendant L'Oréal S.A. is a Société Anonyme, with its principal place of business and headquarters located at 41 Rue Martre, 92117 Clichy, Hauts-de-Seine, France.

8. Defendant L'Oréal S.A. is liable to Plaintiff under the facts alleged in this complaint by virtue of its own acts and omissions, as well for the acts and omissions of its agents, joint venturers, and alter ego subsidiaries, Defendants L'Oréal USA, Inc., and L'Oréal USA Products, Inc.

## JURISDICTION AND VENUE

9. This Court has subject-matter jurisdiction over this litigation under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, and Plaintiff and Defendants are citizens of different states.

10. This Court has specific personal jurisdiction over the Defendants in accordance with the United States Constitution. Defendants have sufficient minimum contacts with Ohio. Defendants purposedly availed themselves to jurisdiction in Ohio by marketing, advertising, and selling their hair dye products to licensed cosmetologists, such as Ms. Bowman, in Ohio. Plaintiff's action against these Defendants arises out of Defendants' Ohio-directed commercial activities.

11. Venue is proper in this Court pursuant to 18 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this litigation occurred in this District. Plaintiff's purchases, occupational use, and exposure to Defendants' professional hair dye products occurred in Columbus, Ohio. Plaintiff's diagnosis of bladder cancer as a result of her exposure to Defendants' products occurred in this District.

## FACTUAL ALLEGATIONS

### A. As a licensed cosmetologist, Ms. Bowman was exposed to Defendants' carcinogenic hair dyes daily for over 45 years.

12. Ms. Bowman became a licensed cosmetologist in Ohio in 1973. Ms. Bowman practiced as a licensed cosmetologist in the Columbus, Ohio area from 1973–2020.

13. A core part of Ms. Bowman's business, as a professional hair stylist, was providing hair coloring services for her clients. Throughout her career, he devoted a significant portion of her professional time to mixing, preparing, and applying hair dye products during the course of those services.

14. Ms. Bowman's professional application method consisted of applying the hair dye by hand while wearing protective gloves and allowing the product to remain on the client's hair for the manufacturer-recommended processing time so that the dye could fully penetrate and color the hair in accordance with the manufacturer's instructions.

15. After a period of weeks or months, and depending on the hair's natural growth rate, the colored portion of the hair grows away from the scalp as new growth sprouts from the roots. As the hair continues to grow, an obvious contrast emerges between the colored portions and the new hair growth, prompting Ms. Bowman's clients to color their hair on a routine basis to match the rest of their hair.

16. Ms. Bowman performed approximately three applications per workday for the duration of her career, causing her to be exposed to Defendants' toxic hair dye products on a weekly basis, multiple times per week, for over forty-five years, as she applied the products to her clients' scalp.

17. Ms. Bowman purchased and applied Defendant Wella's Color Charm and Clairol Permanent hair dye products to her clients' scalp multiple instances per week for the duration of her career.

18. Ms. Bowman purchased and applied Defendant L'Oreal's Redken and Matrix hair dye products to her clients' scalp multiple instances per week for the duration of her career.

19. None of the Defendants' hair dyes Ms. Bowman used and applied contained any warning that long-term occupational exposure to Defendants' products could increase the risk of developing bladder cancer.

**B. Ms. Bowman developed bladder cancer from her exposure to Defendants' hair dyes, forcing him to undergo painful, stressful, and expensive treatment and monitoring.**

20. In June 2010, Ms. Bowman was diagnosed with bladder cancer—low-grade papillary urothelial carcinoma—at Riverside Methodist Hospital in Columbus, Ohio. During the same month, Ms. Bowman underwent a TURBT procedure with double-J stent placement, retrograde pyelogram, and intravesical mitomycin.

21. In October 2010, Ms. Bowman underwent a cystoscopy with fulguration of the bladder.

22. As a result of the diagnosis and resulting treatment for bladder cancer, Ms. Bowman suffered significant business income loss, out of pocket medical expenses, severe pain, and mental distress.

23. Ms. Bowman's injuries, including her bladder cancer and the resulting necessary treatments, were directly and proximately caused by her exposure to and use of Defendants' hair dye products.

24. As a result of Defendants' acts and/or omissions, Ms. Bowman has suffered and will continue to suffer bladder cancer and other physical injuries, medical and hospital costs, economic damages, severe emotional distress, mental pain and suffering, fear of cancer recurrence,

humiliation, embarrassment, fear, annoyance, inconvenience, loss of enjoyment of life, lost wages and other damages under the law, which Ms. Bowman is entitled to recover.

25. Ms. Bowman did not know that her occupational exposure to Defendants' hair dye products could cause her bladder cancer until she personally conducted research on the connection between bladder cancer and occupational hair dye use in approximately November 2024. Ms. Bowman was never informed by a medical provider that her cancer could have been caused by occupational exposure to hair dye products.

### C. Defendants designed, marketed, and sold their toxic hair dyes even though they knew, or should have known, that continuous long-term exposure would significantly increase stylists' risk of cancer.[1]

26. For decades, Defendants have designed, manufactured, and marketed their hair dye products to customers across the United States and the world. Defendants' marketing schemes heavily leverage branding and slogans that emphasize how dyed hair enhances users' physical beauty, sex appeal, and youthfulness, all while failing to inform consumers, such as plaintiff, of the carcinogenic risks of usage of their hair dyes.

#### 1. Wella

27. Wella[2] has long marketed its hair dye products as safe and effective, often emphasizing their commitment to quality and innovation.

28. For example, Wella solidified its grip on the beauty industry with the launch of its *Koleston* hair dye in 1950, which it claims was "the first cream colourant that nourishes the hair."[3]

---

[1] The following discussion of various manufacturers and/or products is not an exhaustive list of all hair dye manufacturers and/or products that have been marketed to professional and retail users, nor is it an exhaustive list of all manufacturers and/or products currently on the market. Rather, it is a representative sample of how each Defendant has marketed their hair dye products throughout the years.

[2] "Wella" as used herein, refers to Defendants Wella International Operations Switzerland S.A.R.L., and Wella Operations US LLC d/b/a The Wella Company.

[3] WELLA PROFESSIONALS, *Over 140 Years of Passion: Our History*, https://www.wella.com/professional/en-AU/about-the-brand (last visited May 18, 2026).

29. The *Koleston* hair dye became so popular among stylists—reaching 5.5 tubes sold worldwide in its first three years—that it spawned multiple subsequent derivative hair dye product lines.[4] Wella's initial hair dye success influenced the company to continue their intentional marketing towards stylists by providing "the most up-to-date salon equipment available," and even opening a research lab in 1957 for "developing advanced hair care, colour and styling solutions, driving breakthroughs that shape the professional hairdressing industry."[5]

30. The decades-long success of *Koleston* hair dye products led Wella to relaunch the *Koleston* product line as "*Koleston Perfect*" in 1995, claiming that it had more "natural ingredients like fruit wax" that would better ensure healthy hair.[6]

31. *Koleston Perfect* remains one of Wella's most popular professional hair dye product lines, currently marketed as Wella's "purest permanent hair color and the first and only professional hair color combining uncompromised color performance with Metal Purifier and ME+ Dye Technology for true-to-tone color and protection from damage."[7]

32. *Koleston* is not Wella's only prominent hair dye. Its *Color Touch* product line was launched in 1988 and saw multiple variations across the next several decades including *Color Sensations* in 2002, an advanced hair dye product intended for professional application that allowed for more creative hair colors.[8]

33. Wella's *Illumina Color* line, launched in 2012, is one of the most popular hair dye products commonly used by professional hair stylists. This line is marketed as a breakthrough in hair dye technology which "helps to protect hair from extra damage happening in the presence of

---

[4] *Id.*
[5] *Id.*
[6] *Id.*
[7] WELLA STORE, *Koleston Perfect 7/0 Medium Blonde/ Natural Permanent*, https://us.wella.professionalstore.com/en-US/product/koleston-perfect-7-0-medium-blonde-natural-permanent/000000099350121004 (last visited May 18, 2026).
[8] WELLA PROFESSIONALS, *Over 140 Years of Passion: Our History*, https://www.wella.com/professional/en-AU/about-the-brand (last visited May 18, 2026).

metals wherever color is placed."[9] The *Illumina Color* product line is heavily advertised in salons and professional hairdressing communities as a gentler alternative to other hair dyes.

34. Despite its "breakthrough" formulas and Wella's misleading assurances of safety, Wella has never disclosed or warned professionals that its *Koleston Perfect*, *Color Sensations*, *Illumina Color*, and other professional hair dye products still contain aromatic amines and other carcinogenic properties, and nowhere in the marketing for these products does Wella warn of the increased risk of bladder cancer associated with occupational exposure.

35. Even Wella's *Color Fresh CREATE* product line— marketed as a "ammonia-free, fragrance-free, and peroxide-free formula"—still contains carcinogens.[10]

**2. L'Oréal**

36. In 1978, L'Oréal[11] launched *Majirel*, "the first-ever protective color" product it designed exclusively for application by professional stylists in salon settings.[12] The *Majirel* hair dye line allowed L'Oréal to permeate the salon industry, offering a "hair color protected and enhanced" permanent hair dye that disguised the products' harsh chemical processes behind promises of nourishment.[13]

37. L'Oréal later introduced *iNOA* in 2009, touting its "first-ever ammonia free" permanent hair color product.[14]

38. L'Oréal heavily emphasizes their dedication to the safety of stylists, stating "[s]ince our invention of hair color more than 110 years ago, L'Oréal professional has supported

---

[9] WELLA PROFESSIONALS, *Illumina Color*, https://www.wella.com/professional/en-US/illumina-color (last visited May 18, 2026).

[10] WELLA PROFESSIONALS, *Color Fresh Create: Semi-permanent, expressive color palette*, https://www.wella.com/professional/en-US/color-fresh-create (last visited May 18, 2026).

[11] "L'Oréal" as used herein, refers to Defendants L'Oréal USA, Inc., L'Oréal USA Products, Inc., and L'Oréal S.A.

[12] L'ORÉAL PROFESSIONAL PARIS, *L'Oréal Professional Heritage Book*, (2022), https://www.lorealprofessionnel.in/-/media/project/loreal/brand-sites/lp/apac/in/patrimoine-book/landing-page/loreal_professionnel_heritage_book.pdf?

[13] *Id.*

[14] *Id.*

professional talent through our obsession with innovation, tech and ***safety*** for stylists and women."[15]

39. L'Oréal anchors their history in the aim to free women from the "unpredictable and sometimes dangerous" methods women once used to cover white or gray hair, by marketing invention of a "harmless hair color dyeing process" that "[a]t last, [gave] women [] a safe product to hide their white or gray hair."[16]

40. In recent years, L'Oréal has continued its calculated approach. By launching "natural" options like *Botanea*,[17] the company sought to lure in more health-conscious consumers, still while failing to provide notice of the increased risk of bladder cancer to occupational users of hair dyes.

41. To this day L'Oréal's marketing gives misleading assurances of safety and fails to warn stylists and consumers that their professional hair dye products contain dangerous carcinogens known to increase the risk of bladder cancer.

### D. Defendants designed and made their hair dyes using ingredients which they knew were carcinogenic.

42. The defendants' hair dye products are carcinogenic, and include carcinogens such as aromatic amines, especially 4-aminobiphenyl (4-ABP),[18] and others such as benzidine, 2-naphthylamine, and 4-chloro-o-toluidine.[19] Several countries banned the use of these carcinogens in hair dyes in the 1970s, but studies since then show that these ingredients still remain in Defendants' hair dyes, especially 4-ABP and other aromatic amines.[20]

---

[15] *Id.* (emphasis added).

[16] *Id.*

[17] GLAMOT.COM, *L'Oréal Professionnel Botanēa*, https://www.glamot.com/b/196713/l-oreal-professionnel-botanea? (last visited May 18, 2026).

[18] Turesky, R. J. et al, *Identification of aminobiphenyl derivatives in commercial hair dyes*, 16 CHEMICAL RSCH. TOXICOLIGY 1162–73 (2003).

[19] Harling, M. et al, *Bladder cancer among hairdressers: a meta-analysis*, 67 OCCUPATIONAL ENV'T MED. 351–8 (2010).

[20] Turesky, R. J. et al, *supra* note 18.

43. Several U.S. and international governmental bodies have identified known and suspected human carcinogens in hair dyes, corroborating a link between hair dyes and bladder cancer.

44. The World Health Organization's International Agency for Research on Cancer ("IARC") convenes working groups of world-renowned experts on cancer biology, epidemiology, and other relevant sciences to review specific potential carcinogen exposures and risk of developing specific cancers. IARC has reviewed and published results of its analysis of carcinogens related to hair dye exposure and its constituent chemicals. It has published papers on carcinogenic effects of hair dyes and occupations with high hair dye exposure in 1971, 1978, 1982, 1987, 1993, 2001, 2010, 2012, and 2020.

45. IARC has classified several hair dye constituents as human carcinogens (Group 1): benzidine, 4-aminobiphenyl (4-ABP), 2-naphthylamine, ortho-Toluidine, and 4,4'-Methylenebis. The IARC also classified 4-Chloro-ortho-Toluidine as "probably carcinogenic to humans" (Group 2A).[21]

46. A 2012 IARC paper which reviewed data from animal exposure studies and human occupational exposure studies found that "[t]here is sufficient evidence in humans for the carcinogenicity of 4-Aminobiphenyl," and concluded that 4-ABP "causes bladder cancer in humans."[22] In that same report, IARC also concluded there is strong evidence indicating 4-ABP is genotoxic, involving metabolic activation, formation of DNA adducts, and induction of mutagenic (causing genetic mutation) and clastogenic (causing chromosome breakage) effects.[23]

47. The U.S. Department of Health and Services' National Toxicology Program ("NTP") has identified o-Toluidine and Coal Tars and Coal-Tar Pitches as "known carcinogens"

---

[21] Baan, R. et al, *Carcinogenicity of some aromatic amines, organic dyes, and related exposures*, 9 LANCET ONCOL 322–3 (2008).
[22] *Chemical agents and related occupations*. 100 IARC MONOGR EVAL CARCINOG RISKS HUM, 9–562 (2012).
[23] *Id.*

among hair dyes' ingredients.[24] It also classified other chemicals in the products as "reasonably anticipated to be a human carcinogen." including, 2,4Diaminoanisole Sulfate; 4-Chloro-o-phenylenediamine; 2,4Diaminotoluene; Disperse Blue 1; Benzidine and dyes metabolized to benzidine; Basic Red 9 Monohydrochloride; and 4,4′Oxydianiline.

48. The FDA acknowledges that, until the 1980s, two carcinogens w commonly contained in hair dyes: 4-methoxy-m-phenylenediamine 2,4-diaminoanisole and 2, 4-methoxy-m-phenylenediamine sulfate 2,4-diaminoanisole sulfate.[25]

49. The National Cancer Institute of the National Institutes of Health ("NIH") associates hair dye exposure with an increased risk of developing bladder cancer.[26]

50. The American Cancer Society notes that hairstylists have an increased risk for bladder cancer, and states this is "probably because of heavy exposure to hair dyes."[27] Relying on other organizations' analysis, the American Cancer Society lists several ingredients from hair dyes as known human carcinogens (i.e., IARC Group 1), including: 4-aminobiphenyl (4-ABP); benzidine; and ortho-toluidine. The American Cancer Society also lists the following ingredients of hair dye as probable human carcinogens (i.e., IARC Group 2A): aniline and aniline hydrochloride; 4-chloro-ortho-toluidine.

51. There are several plausible and generally accepted biological mechanisms that could explain associations between occupational exposure to hair dye products and an increased

---

[24] Nat'l Toxicology Program, U.S. Dep't of Health & Hum. Servs., *Report on Carcinogens: o-Toluidine* (15th ed. 2021), https://ntp.niehs.nih.gov/sites/default/files/ntp/roc/content/profiles/toluidine.pdf; Nat'l Toxicology Program, U.S. Dep't of Health & Hum. Servs., *Report on Carcinogens: Coal Tars and Cola-Tar Pitches* (15th ed. 2021), https://ntp.niehs.nih.gov/sites/default/files/ntp/roc/content/profiles/coaltars.pdf.

[25] *Hair Dyes*, U.S. FOOD & DRUG ADMIN. (Sept. 25, 2025), https://www.fda.gov/cosmetics/cosmetic-products/hair-dyes.

[26] *Hair Dyes, Other Hair Products, and Cancer Risk*, NAT'L CANCER INST. (Dec. 1, 2022), https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/hair-dyes-fact-sheet.

[27] *Bladder Cancer Risk Factors*, AM. CANCER SOC'Y, https://www.cancer.org/cancer/types/bladder-cancer/causes-risks-prevention/risk-factors.html (last visited June 5, 2026).

risk of bladder cancer. For example, a 1975 study by the University of California, Berkley, found that multiple constituents in hair dyes were mutagenic.[28]

52. Highly relevant to bladder cancer is the discovery that paraphenylenediamine ("PPD"), one of most common aromatic amines used in Defendants' hair dyes, is genotoxic to uroepithelial cells, which line the inside of the bladder and form the majority of bladder cancers.[29]

53. The presence and number of DNA adducts are considered a direct measure of how much a carcinogen has bound to a cell's DNA, which can induce mutagenesis. Lactating women who use hair dye were eight times more likely to have 4-ABP-DNA adducts in breast epithelium excreted in milk compared to non-hair-dye users. Among women who had used hair dye more than once in the past 6 months, the risk of having 4-ABP DNA adducts increased by 11 times. Risk was increased similarly for temporary and permanent hair dye.[30]

54. Defendants were aware or should have been aware of the increased risk of developing bladder cancer from the occupational use of their hair dye products based on their access to these and other scientific studies, ongoing research, and various government standards and regulations.

**E. Multiple reliable peer-reviewed studies confirm frequent and long-term exposure to the Defendants' hair dye products increase the risk of developing bladder cancer.**

55. Dozens of scientific studies in the United States and abroad, conducted over many decades, have consistently shown an increased risk of bladder cancer from occupational exposure to hair dye products.

---

[28] *See* Bruce N. Ames et al., *Hair Dyes are Mutagenic: Identification of a Variety of Mutagenic Ingredients*, 72 PROC. NAT'L ACAD. SCI. 2423 (1975), https://doi.org/10.1073/pnas.72.6.2423.
[29] Huang, Y. C. et al (2007). *p-Phenylenediamine induced DNA damage in SV-40 immortalized human uroepithelial cells and expression of mutant p53 and COX-2 proteins*, 170(2) TOXICOLOGY LETTERS 116–123.
[30] Christine B. Ambrosone et al., *Hair Dye Use, Meat Intake, and Tobacco Exposure and Presence of Carcinogen-DNA Adducts in Exfoliated Breast Ductal Epithelial Cells*, 464 ARCH. BIOCHEM. BIOPHYS. 169 (2007).

56. The risk of developing bladder cancer from hair dyes is particularly significant for hairstylists like Plaintiff because of her frequent exposure to hair dyes in her everyday employment. Hairstylists' exposure to the carcinogenic chemicals in Defendants' hair dyes is far greater than those who use and apply hair dyes at home.

57. Several studies have analyzed the risk of bladder cancer among hairstylists. These studies consistently show ***working as a hairstylist increases the risk of bladder cancer by 30% or more***. Moreover, the most recent global meta-analysis of occupational risk and bladder cancer also found that the risk of bladder cancer ***mortality*** was 16% higher among hairstylists.

58. Two meta-analyses (which aggregate the results of many individual studies) specifically focus on the risk of bladder cancer among hairstylists. A 2010 meta-analysis by Harling *et al*., aggregated the findings of 42 other studies on this topic, each of which involved hairstylists with clinically confirmed bladder cancer.[31] This analysis found that overall, ***hair stylists are 34% more likely to develop bladder cancer as a result of occupational exposure to hair dyes***.

59. Among the studies evaluated by Harling *et al*., that focused on long-term exposure, three looked at people who worked as a hairstylist for five years or longer. ***The relative risk of bladder cancer in that group was 52% greater***.

60. Together, the studies analyzed by Harling *et al*. ranged from the 1970s, to the 1990s and beyond, suggesting any changes in hair dye formulation over time have not sufficiently reduced carcinogen exposure for hairstylists.

61. Harling *et al.* also found consistent increases in risk across broad geographic areas in the United States and Canada. The relative risk of bladder cancer was almost identical between the studies that adjusted for smoking and those that did not.

62. Another meta-analysis—published in the *International Journal of Epidemiology* in 2009 by Takkouche *et al.*—aggregated the results of 34 studies on cancer risk among hairstylists

[31] Harling et al., *supra* note 19.

from 1966 to 2009.[32] Across the studies, the relative risk of bladder cancer in hairstylists and related occupations was 36% higher. ***For the subset of studies that looked at mortality from bladder cancer, the relative risk was 53% greater.*** In the four studies that focused on people with more than 10 years of hairdressing experience (versus no hairdressing), the risk for bladder cancer ***almost doubled*** (93% greater). The report found no substantial difference in relative risk by time period, whether the studies were performed in the 1970s or later.

63. Other meta-analyses have evaluated the risk of bladder cancer across many professions, including hairstylists. First, a 2015 global meta-analysis by Cumberbatch *et al*. in *JAMA Oncology* found not only did the risk of bladder cancer increase by 32% among hairstylists, but also the risk of *mortality* from bladder cancer increased by 16%.[33] It also found the risk of bladder cancer was highest among occupations in which employees were routinely exposed to aromatic amines, specifically listing hairstylists as one of the occupations at issue.

64. The Cumberbatch *et al*. study found the main carcinogen for hairstylists is 4-aminobiphenyl (4-ABP), which IARC has designated as carcinogenic to humans (*i.e.*, a Group 1 carcinogen). Although the chemical has been restricted since the 1970s, a 2003 study by Turesky *et al.* found 4-ABP was present in eight out of eleven hair dyes they purchased and tested the year purchased.[34]

65. A 2008 meta-analysis of bladder cancer across occupations by Reulen *et al.* looked at 29 individual studies and found the relative risk of bladder cancer among hairstylists was 23% greater. The authors identified hairstylists' frequent exposure to hair dyes as the likely culprit of the increased risk, explaining hair dyes "may contain arylamines, which may be absorbed via the skin or inhaled by the lungs," and that "[o]nce processed in the body, concentrated amounts of

---

[32] Bahi Takkouche et al., *Risk of Cancer Among Hairdressers and Related Workers: A Meta-Analysis*, 38 INT'L J. EPIDEMIOLOGY 1512 (2009), https://doi.org/10.1093/ije/dyp283.

[33] Marcus G. K. Cumberbatch et al., *Contemporary Occupational Carcinogenic Exposure and Bladder Cancer: A Systematic Review and Meta-Analysis*, 1 JAMA ONCOLOGY 1382 (2015), https://doi.org/10.1001/jamaoncol.2015.3209.

[34] Turesky, R. J. et al, *supra* note 18.

arylamines may be found in the bladder, inducing carcinogenic processes and eventually leading to the development of bladder tumours."[35]

66. A 2003 meta-analysis looked at 11 studies of bladder cancer in men in Western Europe between 1976 and 1997, which were based on more than 3,000 cases. The study investigated associations with occupational exposures. Among people who worked for more than 25 years as a hairstylist, the study found a 60% increase in the risk of bladder cancer.[36]

67. Many other studies have also found an increased risk of bladder cancer among hairstylists. For example, a 2015 study of 15 million individuals in Northern Europe, which investigated links between occupational history and cancer risk, found professional hair coloring was associated with the second-highest risk level for bladder cancer.[37] A nationwide study in New Zealand in 2008 found ***hairstylists were over nine times more likely to develop bladder cancer***.[38] A 2005 study of occupation and bladder cancer in Sweden found a 26% increased risk of bladder cancer among hairstylists.[39] A 2001 publication studying a Los Angeles population of 1,500 cases found those who had ever been employed as a hairstylist or barber were at a 50% increased risk of bladder cancer—but for the people who had worked as a hairstylist or barber for over 10 years, ***the relative risk became 510% greater***.[40]

## CAUSES OF ACTION

[35] Raoul C. Reulen et al., *A Meta-Analysis on the Association Between Bladder Cancer and Occupation*, 42 SCANDINAVIAN J. OF UROLOGY & NEPHROLOGY 74 (2010), https://doi.org/10.1080/03008880802325192.
[36] Manolis Kogevinas et al., *Occupation and Bladder Cancer Among Men in Western Europe*, 14 CANCER CAUSES & CONTROL 907 (2003), https://doi.org/10.1023/b:caco.0000007962.19066.9c.
[37] Eero Pukkala et al., *Occupation and Cancer—Follow-up of 15 Million People in Five Nordic Countries*, 48 ACTA ONCOLOGICA 646 (2009), https://doi.org/10.1080/02841860902913546.
[38] Evan Dryson et al., *Case-Control Study of High Risk Occupations for Bladder Cancer in New Zealand*, 122 INT'L J. CANCER 1340 (2008), https://doi.org/10.1002/ijc.23194.
[39] Jianguang Ji et al., *Occupation and Bladder Cancer: A Cohort Study in Sweden*, 92 BRITISH J. CANCER 1276 (2005), https://doi.org/10.1038/sj.bjc.6602473.
[40] Manuela Gago-Dominguez et al., *Permanent Hair Dyes and Bladder Cancer: Risk Modification by Cytochrome P4501A2 and N-acetyltransferases 1 and 2*, 24 CARCINOGENESIS 483 (2003), https://doi.org/10.1093/carcin/24.3.483.

**COUNT I**
**Strict Product Liability – O.R.C. § 2307.76 – Failure to Warn**
***Against All Defendants***

68. Plaintiff incorporates by reference the allegations contained in Paragraphs 12-67 as if fully restated herein.

69. For each product identified in Paragraphs 17-18, Defendants Wella and L'Oreal were the manufacturers within O.R.C. § 2307.71(A)(9), because they designed, formulated, produced, constructed, created, assembled, or rebuilt the hair dye products used by Plaintiff.

70. The products identified in Paragraphs 17-18 were defective under O.R.C. § 2307.76 because Defendants did not disclose the increased risk of bladder cancer at the time of marketing or at any time post-marketing to occupational users such as Plaintiff. The risk was not open and obvious to an ordinary professional user.

71. The defect existed when the products identified in Paragraphs 17-18 left the manufacturer's control and thereafter.

72. When the products identified in Paragraphs 17-18 left Defendants' control, the Defendant knew or, in light of reasonably available scientific information, should have known that repeated occupational exposure involved an increased risk of bladder cancer. Defendants had a duty to warn Plaintiff, a foreseeable user of their professional hair due products of the risk of harm.

73. In addition, after the products identified in Paragraphs 17-18 left Defendants' control, Defendants had a continuing post-sale duty to warn Plaintiff that repeated occupational exposure involved an increased risk of bladder cancer.

74. A reasonable manufacturer in the same or similar circumstances would have provided an adequate warning or instruction concerning the increased risk of bladder cancer associated with occupational use of hair dyes, in light of the likelihood and seriousness of harm that could be suffered by users such as Plaintiff.

75. The inadequate warning or instruction was a direct and proximate cause of Plaintiff's injury. Had an adequate warning or instruction been provided, Plaintiff would have avoided or materially reduced the harmful exposure.

76. The identified product was the actual product designed, formulated, produced, constructed, created, assembled, or rebuilt by the identified manufacturer, as required by O.R.C. § 2307.73(A)(3).

77. As a direct and proximate result of Defendants' failure to warn, O.R.C. § 2307.73(A)(2), Plaintiff has suffered and will continue to suffer bladder cancer and other physical injuries, medical and hospital costs, economic damages, severe emotional distress, mental pain and suffering, fear of cancer recurrence, humiliation, embarrassment, fear, annoyance, inconvenience, loss of enjoyment of life, lost wages and other damages under the law, which Plaintiff is entitled to recover. Defendants' failure to warn Plaintiff was a substantial factor in causing each of the damages outlined here.

78. Plaintiff is entitled to compensatory damages under O.R.C. §§ 2307.73 and 2307.79.

79. Plaintiff demands punitive damages under O.R.C. §§ 2307.80. Defendants' decades-long failure to warn professional hair stylists—their customers—of the increased risk of bladder cancer as result of foreseeable occupational use of their hair dye products demonstrates a flagrant disregard for the safety of users such as Plaintiff.

**COUNT II**

**Strict Product Liability - Defective Design or Formulation, O.R.C. § 2307.76**

***Against All Defendants***

80. Bowman incorporates Paragraphs 12-67 as if fully restated herein

81. For each product identified in Paragraphs 17-18, Defendants Wella and L'Oreal were the manufacturers within O.R.C. § 2307.71(A)(9), because they designed, formulated, produced, constructed, created, assembled, or rebuilt the hair dye products used by Plaintiff.

82. The foreseeable risks associated with the design or formulation of the products identified in Paragraphs 17-18 exceeded their benefits, considering the nature and magnitude of the bladder-cancer risk, the likelihood of harm from repeated occupational exposure, the intended and reasonably foreseeable use by professional stylists, and the products' cosmetic utility.

83. At the time the product left the manufacturer's control, a practical and technically feasible alternative design formulation existed which would have prevented or materially reduced Plaintiff's harm without substantially impairing the product's usefulness or intended purpose and without introducing an equal or greater risk.

84. Alternatively, the risk presented by the design of the Products listed in Paragraphs 17-18 was so manifestly unreasonable in light of the product's cosmetic utility that a reasonable person would not use the product. O.R.C. § 2307.75(A)(2).

85. The defective design or formulation was a direct and proximate cause of Plaintiff's bladder cancer and damages.

86. Plaintiff is entitled to compensatory damages under O.R.C. §§ 2307.73 and 2307.79.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants on each of the above-referenced claims and causes of action, and as follows:

(a) Awarding past and future non-economic compensatory damages including, but not limited to, physical injury, loss of bodily function, pain, suffering, discomfort, fright, nervousness, anxiety, worry, apprehension, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

(b) Awarding past and future economic damages in the form of medical expenses, out-of-pocket expenses, lost earnings, opportunity costs, and other economic damages in an amount to be determined at trial of this action;

(c) Awarding damages and/or equitable relief to provide medical monitoring for the early detection, diagnosis, and treatment of injuries related to the Products and prevention of exacerbation of such injuries;

(d) Awarding punitive and/or exemplary damages for Defendants' wanton, willful, fraudulent, reckless acts which demonstrated a complete disregard and reckless

indifference for the safety and welfare of the general public, and to Plaintiff, in an amount sufficient to punish Defendants and deter future misconduct;

(e) Statutory damages;

(f) Prejudgment interest;

(g) Post-judgment interest;

(h) Plaintiff's reasonable attorneys' fees and costs;

(i) The costs of these proceedings; *and*

(j) Such other and further relief as this Court deems just and proper.

DATED: October 9, 2026

Respectfully Submitted,

*/s/ Mark Abramowitz*
Mark Abramowitz
DICELLO LEVITT LLP
8160 Norton Parkway, 3rd Floor
Mentor, Ohio 44030
Tel.: (440) 953-8888
mabramowitz@dicellolevitt.com

Diandra S. Debrosse*
DICELLO LEVITT LLP
485 Lexington Ave Suite 1001
New York, New York 10017
Tel.: (646) 933-1000
fu@dicellolevitt.com

Eli J. Hare*
Elton H. Darby III*
DICELLO LEVITT LLP
505 20th Street S, Suite 1500
Birmingham, Alabama 35203
Tel.: (205) 855-5700
ehare@dicellolevitt.com
edarby@dicellolevitt.com

*Counsel for Plaintiff*

**Pro hac vice* application forthcoming